### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### ORLANDO DIVISION

CHARLES E. MCNEEL,

                **Plaintiff,**

-vs-                                   **Case No.  6:05-cv-1153-Orl-31JGG**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY,

                **Defendant.**

_____

## MEMORANDUM OF DECISION

Plaintiff Charles E. McNeel ["McNeel"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying his application for a period of disability and disability insurance and supplemental security income benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

**I.**      **PROCEDURAL HISTORY**

On February 20, 2002, McNeel filed a claim for disability insurance benefits and supplemental security income benefits, claiming disability as of June 1, 1999 due to osteoarthritis, back injuries, bilateral heel fractures, and pain in his feet, shoulders, and wrist.  R. 45 - 47, 67, 401 - 03, 404, 408.  McNeel's claim was denied initially on August 23, 2002.  R. 25, 405.  McNeel filed a request for reconsideration, R. 28, and on April 18, 2003, the Commissioner found McNeel disabled as of September 1, 2002.  R. 29 - 30, 409 - 10.  McNeel requested a hearing by an Administrative Law Judge claiming disability as of June 1, 1999, the earlier onset date.  R. 31.  On January 6, 2005, the

Honorable Theodore S. Haynes, Administrative Law Judge ["ALJ"], held a hearing on McNeel's claim in Orlando, Florida.  R. 413 - 36.  Attorney J. Michael Matthews represented McNeel at the hearing.  R. 413.  The ALJ heard testimony from McNeel, an impartial vocational expert ["VE"], and Geraldine Harris, McNeel's mother.  R. 413 - 14, 433.

On March 25, 2005, the ALJ issued a decision that McNeel was not disabled and not entitled to benefits from June 1, 1999 through August 31, 2002.  R. 14 - 21.  Following a review of the medical and other record evidence, the ALJ found that McNeel could not perform his past relevant work as a truck driver and construction steel worker.  R. 15, 20, Finding 7.  The ALJ found that during the relevant period, McNeel nevertheless retained the residual functional capacity ["RFC"] to perform the physical exertional requirements for a "significant range" of sedentary work.  R. 20, Finding 11. After hearing testimony from the VE and applying the Medical-Vocational Guidelines, the ALJ concluded that McNeel was not disabled "at any time from the alleged onset date of June 1, 1999 through August 31, 2002."[1]  R. 20, Finding 13.

The Appeals Council denied review.  R. 6 - 8.  On August 5, 2005, McNeel timely appealed the Appeals Council's decision to the United States District Court.  Docket No. 1.  On January 4, 2006, McNeel filed in this Court a memorandum of law in support of his appeal.  Docket No. 14.  On March 6, 2006, the Commissioner filed a memorandum in support of her decision that McNeel was not disabled.  Docket No. 15.  The appeal is ripe for determination.

---

[1]The Social Security ALJs face a herculean task.  The Commissioner now expects ALJs to hear and decide 50 to 55 decisions per month according to a former Chief ALJ in a July 2005 presentation at a Federal Judicial Center workshop on disability appeals.  With only the help of non-attorney decision-writers and staff attorneys, the ALJs must rapidly process a monumental backlog of thousands of complex, aging cases.  The effects are felt in the district court. According to the AOUSC, the Middle District of Florida has the third highest volume of disability appeals in the nation. Each magistrate judge in the Orlando Division, for example, resolves approximately fifty-three appeals every year — an average of about one per week.

## II.    THE PARTIES' POSITIONS

McNeel assigns two errors to the Commissioner.  First, McNeel claims that the Commissioner erred by finding that McNeel was not presumptively disabled because he did not meet or equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Docket No. 14 at 6 - 8. Second, McNeel claims that the Commissioner erred by failing meet her burden to establish that McNeel could perform other work that exists in the national economy.  *Id.* at 11.  More specifically, McNeel argues that the ALJ failed to accurately describe McNeel's limitations in his hypothetical questions to the VE.  *Id.* at 8 - 11.

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner argues that McNeel failed to meet his heavy burden to show that he was presumptively disabled.  Docket No. 15 at 6, 11.  According to the Commissioner, the ALJ correctly determined that McNeel did not meet or equal one of the listed impairments during the relevant period.  *Id.* at 6, 11.  Second, the Commissioner argues that she met her burden to establish McNeel's vocational opportunities because the ALJ posed a proper hypothetical to the vocational expert.  *Id.* at 12 - 15.

## III.    THE STANDARD OF REVIEW

### A.    AFFIRMANCE

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553,

1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

## B.    REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.   42 U.S.C. § 405(g)(Sentence Four).   The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).   This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already

considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord, Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.    REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30 (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and

could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92;  *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to file modified findings

of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does

not enter a final judgment until after the completion of remand proceedings.[2]  *Id.*

## IV.   THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the

claimant unable to do his or her previous work, or any other substantial gainful activity which exists

in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.   DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438

(11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner

also has a duty to notify a claimant of the statutory right to retained counsel at the social security

hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662

F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the

right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d

at 735 - 36.

---

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.* Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits. *Bergen v. Comm'r of Soc. Sec.*, 454 F. 3d 1273, 1278 n.2 (11th Cir. 2006).

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty. *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982). This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Cowart*, 662 F.2d at 735 (citations omitted).

**B.    THE FIVE STEP EVALUATION**

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled. 20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process.

-8-

42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.  A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"].  This assessment measures whether a claimant can perform past relevant work despite his or her impairment.  20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull.  *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant.  *See* SSR 82-61.  If so, the claimant is not disabled.  If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy.  SSR  82-61.  In determining the

physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c).  If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability.  *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

## C.   OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"].  *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.    TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);  *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion

on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner.  20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error.  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).  Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence.  *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.   PAIN

Pain is a non-exertional impairment.  *Foote*, 67 F.3d at 1559; 826 F.2d at 1003.  Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1529.  In determining whether the medical signs and

laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote*, 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

## F.    CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination

is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

### G.       MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

### H.       THE EVALUATION OF MENTAL DISORDERS

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in nine diagnostic categories.  20 C.F.R. Pt. 404, Subpt. P, App. 1.   The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional

-15-

areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings. 20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity.  The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning;  concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work).  A "marked" degree of limitation means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The technique is used in connection with the sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520a and 416.920a.

-16-

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living;  social functioning;  concentration, persistence and pace;  or ability to tolerate increased mental demands (stress).  This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports.  It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Some individuals may actually have worked during the period of time pertinent

to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms.  Such individuals may be much more impaired for work than their signs and symptoms would indicate.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single examination may not adequately describe these individuals' sustained ability to function.  It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist.  These functional

restrictions are also to be used as the measure of impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission.  In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement. 20 C.F.R. § 404.1594 (iv).

## V.    APPLICATION AND ANALYSIS

### A.    THE FACTS

#### 1.    Facts Before Claimed Onset Date

McNeel was born on November 19, 1962, and was forty-two years old on the date of the ALJ hearing.  R. 45, 417.  McNeel completed eleventh grade, and has past work experience as an iron worker in the construction industry, a truck driver, and a landscaper.  R. 59, 64.  McNeel alleges disability as of June 1, 1999, due to impairments and pain related to back and heel injuries that required numerous surgeries.

On November 16, 1988, McNeel went to the emergency room at Naples Community Hospital, Inc. after an accident at his work at a construction site.  McNeel was climbing scaffolding when he fell approximately forty to fifty feet, landed on both heels, and then fell backwards onto concrete blocks.  R. 107, 109, 111.  Further, as McNeel fell to the ground, he hit a wire, and dislocated his left shoulder.  R. 105, 109.   McNeel underwent a number of medical tests, and was seen by several hospital doctors.  R. 106 - 12, 115 - 39.  The doctors diagnosed severe fractures of both heels and his

right wrist, compression fractures of T12, L1, and L2, dislocated left shoulder anteriorly, and multiple

abrasions.  R. 107 - 12.  In addition, Dr. J. Silverstein, M.D., examined McNeel, and diagnosed

myocardial contusion (a bruise of the heart muscle) secondary to fall, and a questionable urologic

injury to the bladder because of microscopic blood in the urine.  Docket No. 107 - 08.  The doctors,

however, treated McNeel fairly conservatively with pain and anti-inflammatory medications; a sling

for his left shoulder; compression dressings and splits for his right wrist and both legs; and hospital

monitoring.  R. 105, 108, 110.  During his third day in the hospital, the doctors removed his dressings,

and placed his wrist and legs in casts.  R. 110.

On November 25, 1988, the Naples Community Hospital, Inc. discharged McNeel, and

transferred him to Humana Hospital-Lucerne in Orlando, Florida (where McNeel's mother lived)

under the care of Dr. Darrell Shea.  R. 110, 232.  On discharge from the Naples Community Hospital,

Inc., the doctors recommended rehabilitation therapy, and restricted McNeel from any weight-bearing

activities.  R. 87.

Between 1998 and 1991, McNeel underwent multiple surgeries and physical therapy for his

injuries.  R. 140 - 242.  McNeel's surgeries included spinal fusion in his back, and surgeries on his

right foot, including a bone graft on his right heel.  *Id.*; *see also* R. 274 - 75.  McNeel returned to work,

reporting earnings from 1991 through 1996, and again in 1998 through 2001.  R. 50.  After August

1991, McNeel did not seek regular treatment, but saw doctors for occasional complaints of back and

feet pain.  On October 10, 1991, Dr. Egon Johnson, M.D., noted that McNeel was attempting to find

employment as a welder, and prescribed leg braces and working boots to allow McNeel to do welding

work  R. 166.  On December 21, 1992, Dr. Shea stated the McNeel was "doing very well."  R. 170.

On November 29, 1993, Dr. Shea noted that McNeel was independently conducting his activities of daily living, and recommended further physical therapy exercises to increase flexibility of his lower extremities.  R. 169.

Between August 1994 and October 1998, McNeel saw Dr. James P. Ryan, M.D., an orthopedic surgeon, approximately once a year for treatment of his back and heel pain.  R. 293 - 301.  On August 8, 1994, Dr. Ryan assessed bilateral calcaneal fracture (with subtala arthritis and prominent lateral bone mass), and status post thoracolumbar fusion (with loss of extension and persistent back pain).  R. 295.  Dr. Ryan told McNeel that he would not benefit from further surgery in his back, and recommended that McNeel participate in a therapy program to strengthen his back.  *Id.*  The doctor also noted that surgeries had helped McNeel's heels, and recommended that McNeel continue to use braces.  R. 296.  Dr. Ryan ordered braces for McNeel's heel and instructed him to return for another appointment after completing physical therapy.  *Id.*  In a Progress Report dated October 10, 1994, the Longwood Rehabilitation Services reported that McNeel went to three physical therapy appointments, and then stopped appearing.  R. 245.  The Report states that "[w]e have called him but cannot get a response."  *Id.*

McNeel continued to see Dr. Ryan on a yearly basis between 1994 and 1998.  R. 293 - 301.  On October 12, 1995, McNeel told Dr. Ryan that he had been wearing orthotics and braces, but that high top, lace-up leather boots were more comfortable.  R. 299.  Dr. Ryan noted that while wearing the boots, McNeel was able to walk with a minimal limp and had no pain.  *Id.*  McNeel also stated that he was working as a commercial truck driver, and that he was able to work without difficulty.  *Id.*  Dr.

Ryan prescribed the lace-up boots.  *Id.*  On October 30, 1996, McNeel complained of back spasms, weakness on his right side, and increasing kyphosis toward the end of each day.  R. 298.

Dr. Ryan noted that his neurological examination was normal, and recommended that McNeel visit a spine surgeon.  *Id.*  On September 15, 1997, McNeel saw Dr. Ryan, and complained of back pain and a rash on his back.  *Id.*  McNeel also stated that his foot "continues to bother him."  *Id.*  Dr. Ryan prescribed Soma "to be used on an intermittent basis," and orthotics.  *Id.*  On October 23, 1998, McNeel returned to Dr. Ryan with complaints of tenderness at the thoracolumbar junction, as well as problems with nausea and vomiting after eating solid foods.  R. 297.  X-rays of McNeel's lumbar spine showed the prior healed compression fracture, and no other abnormalities.  R. 297.  Dr. Ryan stated that McNeel's back did not appear to be causing his pain, and assessed a gastric or duodenal ulcer.  *Id.*  Dr. Ryan prescribed Soma, and referred him to a gastroenterologist for evaluation of his gastric difficulties.  *Id.*

### 2. The Claimed Period of Disability (June 1, 1999 – August 31, 2002)

McNeel alleges disability as of June 1, 1999.  McNeel failed to appear for an appointment with Dr. Ryan on June 29, 1999.  R. 297.  On August 9, 1999, McNeel visited Dr. Ryan, and stated that he was having "trouble with both heels."  R. 292.  Dr. Ryan prescribed "special lace-up leather boots," and Soma "to be used on an intermittent basis."  *Id.*

Over a year later, McNeel returned to Dr. Ryan on September 20, 2000.  *Id.*  McNeel complained of "increasingly bothersome" swelling and aching in his right heel, and reported being unable to work because of his symptoms.  *Id.*  McNeel also told Dr. Ryan that he misplaced his back brace.  *Id.*  Dr. Ryan noted that x-rays of McNeel's right heel showed impingement on the fibula.  *Id.*

Dr. Ryan recommended surgery for McNeel's pain, and McNeel agreed to schedule an excision of osteophytes and a subtalar fusion.  *Id.*   The doctor also ordered braces for McNeel's heels, and prescribed Soma for pain.  R. 292.

At the request of the Worker's Compensation carrier for McNeel's employer, McNeel consulted Dr. Daniel Wiernik for a second opinion on the recommended surgery on October 31, 2000. R. 254 - 58.  Dr. Wiernick diagnosed: 1.) status post bilateral calcaneal fractures times, 2.) calcaneaneal fibular impingement secondary for fractures, 3.) sural nerve impingement, secondary to the fractures, and 4.) degenerative joint disease of the right foot subtalar joint.  R. 257.  Dr. Wiernik agreed with Dr. Ryan that McNeel needed surgery.  R. 257-58.  Dr. Wiernik further noted that "[w]ith the severity of [McNeel's] calcaneal fractures, work capabilities at this point would only consist of sedentary desk work . . ."  R. 258.

On January 26, 2001, Dr. Ryan performed an excision of osteophytes and subtalar fusion of Plaintiff's right heel.  R. 270, 286.  In follow-up appointments on January 29 and February 5, 2001, Dr. Ryan prescribed Percocet for McNeel's pain and a boot walker, and instructed McNeel to "continue nonweightbearing [sic]."  R. 288.  On February 15, 2001, Dr. Ryan told McNeel that he may have a stomach ulcer.  R. 283.  On May 2, 2001, McNeel returned to Dr. Ryan wearing his boot walker, but complained of swelling in his foot and having difficulty putting on his boot walker.  *Id.* McNeel also reported improvement in his pain.  *Id.*  Dr. Ryan gave McNeel a prescription for a new boot walker as well as Soma and Percocet "to be used on an intermittent basis."  *Id.*

On July 18, 2001, Anne Gowing, "a Certified Nurse Life Care Planner," completed a medical cost projection for the insurance company of McNeel's former employer.  R. 271-79.  Gowing noted

that McNeel was able to perform all of his activities of daily living, including bathing, grooming, and dressing, and that he was able to ambulate on his own without an assistive device.  R. 276-77.  She also observed that he was able do housework, cooking, and laundry, but that McNeel's mother performed the activities for him.  R. 277.

McNeel returned to Dr. Ryan on August 2, 2001 for follow-up visit after his surgery, and complained of "intermittent pains."  R. 281.  Dr. Ryan noted that McNeel had difficulty walking long distances, and gave him a parking permit for disabled parking.  *Id.*  Dr. Ryan also stated that McNeel "should be able to perform light to moderate duty work."  *Id.*  In a handwritten note dated August 2, 2001, Dr. Ryan stated that McNeel could not lift over twenty-five pounds or do any prolonged walking, squatting, or kneeling.  R. 280.

On July 11, 2002, Dr. Joseph N. DeLuca, M.D., Ph.D., conducted a consultative physical and psychological examination.  R. 318 - 25.  Dr. DeLuca first conducted a clinical interview to evaluate McNeel's mental status.  R. 318 - 20.  The doctor observed that McNeel appeared depressed and unhealthy, and noted evidence of depression, anxiety, and hopelessness, but no suicidal ideation.  R. 319.  McNeel's perceptual functioning was "normal," and his cognitive functioning was "adequate." *Id.*  According to Dr. DeLuca, McNeel was of average intelligence with neuropsychological deficits in the areas of short-term and recent memory and concentration, but McNeel was oriented to time, place, and person.  *Id.*  Dr. DeLuca diagnosed Depression on Axis I, and a Global Assessment of Functioning ("GAF") score of 45 on Axis V.[3]  R. 320.  He also opined that in his daily functioning

---

[3] DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) ["DSM-IV"].  The Global Assessment of Functioning ["GAF"] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations.  DSM-IV at 32.  A GAF code of 41 - 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), or serious impairment in social, occupational, or school functioning (e.g., no friends,

and activities of daily living "[McNeel] is has [sic] impaired social functioning, task persistence, concentration difficulties, and deterioration in work-like settings." R 320. Dr. DeLuca also stated that his prognosis for McNeel's mental status was "guarded," but that McNeel's competency to manage his own funds was "adequate." *Id.*

Dr. DeLuca also completed a physical examination. R. 321 - 23. McNeel was unable to walk on his heels or toes, tandem walk, squat, run, or hop. R. 323. McNeel did, however, ambulate without an assistive device, and stood up from a chair and got on the examining table by himself. *Id.* Dr. DeLucal diagnosed spinal disc disease of the thoracic, lumbar, and sacral spine, and bilateral heel fractures. *Id.* He also opined that McNeel's prognosis was "poor," and that McNeel was "unable to do any work-related activities involving carrying, bending, standing, walking, or sustained walking." *Id.* In a follow-up letter dated August 6, 2002 (in response to a question by the Office of Disability Determinations), Dr. DeLuca opined that McNeel could stand and walk for a maximum of a half an hour at one time and a total of two to three hours in an eight-hour workday. R. 324.

On August 28, 2002, McNeel sought treatment with Dr. Walter Black. R. 351. McNeel complained of pain in his back and nausea with vomiting. *Id.* During the visit, McNeel vomited clear liquid as he lay down for an abdominal examination. *Id.* Dr. Black assessed chronic pain related to the trauma of the fall and gastritis on unknown origin, and prescribed Vistaril (an antihistamine) and Tigan suppositories (to control nausea and vomiting). *Id.*

───────────────

unable to keep a job). *Id.*

### 3.      Period of Disability Beginning September 1, 2002

As noted above, the Commissioner found that McNeel was disabled as of September 1, 2002. R. 29 - 30, 409 - 10.   On September 4, 2002, McNeel returned to Dr. Black for a follow-up appointment.  R. 351.  McNeel reported drinking between a pint and "a fifth of Vodka" per day.  R. 352.  Dr. Black noted that McNeel was able to walk only short distances without a forearm support cane.  R. 351.  Dr. Black's physical examination revealed scoliosis and kyphosis of the back, a short right hip, and braces on both of McNeel's ankles.  *Id.*  Dr. Black assessed chronic back problems, and prescribed Soma.  *Id.*  In his notes, Dr. Black also opined: "It is difficult for me to appreciate how [McNeel] would be able to hold a full time job.  He has chronic misalignments of his spine secondary to multiple surgeries . . . I believe [McNeel] is not a candidate for general employment at this time."  R. 352.

On October 3, 2002, Dr. Black completed a Medical Assessment of Ability to do Work Related Activities (Physical) for McNeel.  R. 348 - 50.  Dr. Black opined that McNeel could lift and carry a maximum and minimum of less than twenty pounds for one tenth of an eight-hour workday.  R. 348. Dr. Black noted that McNeel required permanent ankle bracing and a right forearm walking cane, and stated that McNeel could: stand or walk for ten minutes at a time without interruption and for two hours total in an eight-hour workday; and sit without interruption for a total of six hours in an eight-hour workday  R. 348 - 49.  Further, McNeel could never climb, stoop, crouch, or kneel; had difficulties handling, pushing, and pulling; and had environmental restrictions.  R. 349 - 50.

On October 17, 2002, Jeffrey L. Prickett, a non-examining state agency psychologist opined as to McNeel's mental impairments.  R. 386 - 400.  According to Dr. Prickett, McNeel suffered from

-26-

Depression, but his mental impairments were not "severe." R. 386, 396. Dr. Prickett stated that McNeel was mildly limited in his activities of daily living and in his abilities to maintain social functioning and maintain concentration, persistence, or pace. R. 396. Further, McNeel had no episodes of decompensation. *Id.* The psychologist further stated that McNeel's activities of daily living "indicate that his depression is secondary to his physical condition" and that McNeel "does not have significant difficulty with memory or concentration." R. 400.

On November 12, 2002, at the request of the Office of Disability Determinations, Dr. Sam Ranganathan completed a consultative examination of McNeel. R. 353 - 56. McNeel complained of low back pain that radiated to his legs and of constant pain in his right foot. R. 353. Dr. Ranganathan observed that McNeel was able to get on and off the examination slowly, and that McNeel used an assistive device to walk slowly down the hallway of his office. R. 354. Dr. Ranganthan diagnosed multiple injuries secondary to fall; a history of LS spine surgery; bilateral heel fractures, status post right ankle surgery; and a history of right wrist fracture. R. 355. The doctor also opined that McNeel could: stand and/or walk less than two hours a day "with more frequent breaks"; sit less than six hours with more frequent breaks; and lift and carry less than ten pounds occasionally and frequently. R. 355. Dr. Ranganthan also opined that McNeel had frequent postural and environmental work place limitations (such as avoiding exposure to heights and driving), as well as some manipulative limitations in his right hand. *Id.* The doctor further stated that a "crutch is medically necessary." *Id.*

On March 11, 2003, McNeel saw Dr. Geeta Narula for a consultative examination at the request of the Office of Disability Determinations. R. 365 - 66. McNeel reported having seizures and experiencing pain in his ankles, feet, knees, and back. R. 365. After noting that McNeel was unable

to ambulate in his bare feet, and was able to ambulate with bilateral Loftstrand crutches and braces, Dr. Narula observed that McNeel could not walk "at all" without using crutches. R. 366. The doctor also stated that McNeel had difficulty getting up from a chair, and was unable to stand or sit in the same position for more than fifteen minutes before having to change positions. *Id.* Dr. Narula opined that McNeel "is totally disabled for his occupation as a construction worker or iron welder." *Id.*

On March 18, 2003, Dr. David Z. Kitay, M.D., a non-examining state agency physician, opined as to McNeel's physical RFC. R. 367 - 74. The physician found that McNeel required a hand-held assistive device for ambulation, and that McNeel could: lift and carry ten pounds occasionally and less than ten pounds frequently; stand or walk for up to one hour in an eight-hour workday; sit for approximately six hours in an eight-hour workday; and push and pull without limitation. R. 368. In addition, McNeel could occasionally climb rope and scaffolds; had no manipulative, visual, or communicative limitations; and had to avoid concentrated exposure to hazards such as machinery or heights. R. 369 - 71. The physician further stated that McNeel's symptoms were "consistent and credible given [the] objective findings" and that McNeel was "[t]otally disabled." R. 372.

On April 4, 2003, Dr. Perry M. White, M.D., a consultant in orthopedics for the Office of Disability Office of Medical Evaluation disagreed with Dr. Kitay's RFC Assessment that McNeel could perform less than sedentary work. R. 375. In particular, Dr. White did not agree that McNeel required a hand-held assistive device for ambulation. *Id.* Dr. White reviewed McNeel's medical records, and noted that the first mention of the necessity of a hand-held assistive device was by Dr. Black on September 4, 2002. *Id.* Thus, according to Dr. White, the record "does not support the less

than sedentary [Dr. Kitay RFC Assessment] until sometime between 8/6/02 and 10/3/02, like 9/1/02 [sic]." *Id.*

On April 4, 2003, another non-examining state agency physician completed a Physical RFC Assessment for the period from June, 1, 1999 through August 31, 2002. R. 378. This physician opined that for the relevant time period, McNeel could: lift and carry ten pounds occasionally and frequently; stand and walk for two hours in an eight-hour workday; sit for approximately six hours in an eight-hour workday; and push and pull without limitation in his upper extremities and right foot, and with occasional limitation in the left foot. R. 379. McNeel could never climb ropes or scaffolding, and could occasionally climb ramps and stairs, and occasionally balance, stoop, kneel, crouch, and crawl. R. 380. The physician further stated that McNeel had no manipulative, visual, communicative, or environmental limitations, except that he had to avoid all exposure to hazards such as heights or machinery. R. 381 - 82.

### 4.     Testimony at ALJ Hearing

On January 6, 2005, McNeel testified at the hearing before the ALJ. R. 419 - 29. McNeel testified that, after he applied for disability benefits in 1999, he "made one last desperate attempt to get out into the workforce[,]" and looked for work. R. 418. In 2001, McNeel worked for a landscaping company where he helped "dispense with small tree limbs" for approximately eight hours a day. R. 418 - 19. According to McNeel, in less than one year, the landscaping company terminated McNeel because he could not do the work. R. 420. McNeel testified that between 1998 and 2001, he did some work pulling weeds for another landscaping company, and also worked as a truck driver for less than one year. R. 420 - 22. McNeel stopped working as a truck driver because he had back

spasms.  R. 421.  McNeel further testified that he used a walker to help him walk between 1999 and

2002, and that he was able to stand for no more the fifteen to twenty minutes at a time.  R. 425.

McNeel's attorney asked him about his emotional difficulties during the relevant time period.

*Id.*  The ALJ, however, stopped the attorney, and asked him if he had "any evidence of any treatment

for any type of emotional problem during that timeframe [of June 1, 1999 through August 31, 2002]."

R. 426.  The attorney responded that he did not, and the ALJ stated that:

> unless you can furnish that, then we're not getting into that, because it's not of record
> here.  There's no indication that he had any, and I'm sure with the kind of pain he had,
> he probably was depressed to some degree, but there's no indication from a medical
> standpoint that he had any emotional problems that were documented.  So, if you, if
> you can document that, then that's fine to get into.

R. 426.  McNeel subsequently testified only about his physical problems between 1999 and 2002.  R.

426 - 29.  The VE testified that McNeel would be able to perform "light and/or sedentary unskilled

assembler work or bench work."  McNeel's mother testified that she helped McNeel with his daily

activities and that he was in a wheelchair during the relevant time period.  R. 431, 433 -35.

## B.   THE ANALYSIS

### 1.   Presumptive Disability Under the Listings

McNeel first contends that the medical evidence he presented compels a determination that

he was disabled under Listing 1.02(A) (major dysfunction of a joint due to any cause) or Listing 1.03

(reconstructive surgery or surgical arthrodesis of a major weight-bearing joint) of 20 C.F.R. Part 404,

Subpart P, Appendix 1 [the "Listings" or the "Listing"].  Docket No. 14 at 7.  McNeel claims that his

impairments  –  namely his chronic pain, loss of range of motion, inability to ambulate without

assistive devices, and inability to engage in prolonged walking  –  met or equaled those described in

the Listings. *Id.* at 6 - 8. The Commissioner responds that McNeel did not meet is burden to prove that he was presumptively disabled between June 1, 1999 and August 31, 2002. Docket No. 15 at 4 - 12. In particular, the Commissioner states that Listings 1.02 (A) and 1.03 condition presumptive disability on the inability to ambulate effectively, and that McNeel was able to ambulate effectively during the relevant period. *Id.* at 6.

In order to be considered presumptively disabled, the claimant must meet or equal all the requirements of a Listing. *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990). The claimant bears the burden of establishing the existence of an impairment or combination of impairments that meet or equal the criteria in the listing. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). Mere diagnosis of a listed impairment is by itself not sufficient; the record must contain corroborative medical evidence supported by clinical and laboratory findings. *Id.* at 1218. If a claimant contends that an impairment equals a listed impairment, the claimant must present evidence that describes how the impairment has such an equivalency. *Wilkinson on Behalf of Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987).

Listing 1.02(A) describes "Major dysfunction of a joint(s) (due to any cause)" as:

> [c]haracterized by gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s) . . . [w]ith . . . [i]nvolvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in [Listing] 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.02(A). Listing 1.03 provides that a claimant is presumptively disabled as a result of "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint" if the claimant is unable "to ambulate effectively, as defined in [Listing] 1.00B2b, and return to

effective ambulation did not occur, or is not expected to occur, within 12 months of onset." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.03.  Listing 1.00(B)(2)(b) states that:

> [t]o ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.*, §1.00(B)(2)(b).

Here, after a careful and thorough review of the evidence, the ALJ considered whether Plaintiff's condition met any of the Listings, including the Musculoskeletal Listings.  The ALJ found that McNeel's impairments did not meet or equal the level of severity set forth in any of the Listings, and that none of treating or examining physicians stated findings equivalent to the Listings or listed impairments.  R. 15 - 17.  The Commissioner is correct that McNeel failed to prove that his combined impairments equaled a Listing for the period from June 1, 1999 through August 31, 2002.  The record simply does not support McNeel's arguments that he was presumptively disabled during the relevant time period.

McNeel alleges disability as of June 1, 1999, but McNeel visited Dr. Ryan only once on August 9, 1999 and again one year later, on September 20, 2000.  R. 292.  Between 1999 and 2001, Dr. Ryan prescribed Soma for McNeel's pain to be used only on an "intermittent basis."  R. 283, 292.  In addition, neither McNeel nor Dr. Ryan stated that McNeel was unable to ambulate without an

-32-

assistive device other than using braces or special boots – neither of which are mentioned in Listing 1.00(B)(2)(b).  Dr. Ryan and Dr. Wiernik did recommend surgery for McNeel's right foot pain, but Dr. Wiernik also opined that McNeel was able to perform "sedentary desk work."  R. 258.

Further, after the January 2001 surgery, Dr. Ryan treated McNeel conservatively, and prescribed a boot walker, *not* a hand-held assistive device for ambulation.  R. 283, 288.  As of July 18, 2001, Gowing noted that McNeel was able to perform his activities of daily living and ambulate on his own without an assistive device.  R. 276 - 77.  In August 2, 2001, McNeel complained only of "intermittent pains," and Dr. Ryan opined that McNeel "should be able to perform light to moderate duty work."  R. 281.  The only restrictions stated by Dr. Ryan were that McNeel could not lift over twenty-five pounds or do any prolonged walking, squatting, or kneeling.  R. 280.  Even Dr. DeLuca, who opined on July 11, 2002 that McNeel's prognosis was "poor," did not completely restrict McNeel from work.  R. 323 - 24.  Instead, Dr. DeLuca merely stated that McNeel was "unable to do any work-related activities involving carrying, bending, standing, walking, or sustained walking."  *Id.*

On September 4, 2002, Dr. Black was the first physician to note McNeel's use of a cane for ambulation, and the notes do not indicate that Dr. Black *prescribed* the cane.  *See* R. 351 - 52.  In fact, McNeel visited Dr. Black on August 28, 2002, and the doctor's notes do not mention use of a cane or any other hand-held assistive device.  Finally, the ALJ properly found that, while McNeel did not engage in "substantial gainful activity" as defined by the relevant statues and regulations, the fact that McNeel worked as a landscaper in 1999 and as a truck driver in 2000 and 2001 demonstrates that McNeel was capable of performing "at least sedentary exertional work" between June 1, 1999 and August 31, 2002.  R. 17.  Accordingly, because McNeel failed to prove that his combined impairments

equaled a Listing, the ALJ did not err by finding McNeel not disabled at step three of the sequential analysis.

### 2.      Hypothetical Question to the Vocational Expert

McNeel contends that the ALJ erred by providing an "incomplete" hypothetical to the VE. Docket No. 14 at 8.  According to McNeel, the ALJ failed to include in the question all of McNeel's exertional and non-exertional impairments, including limitations on the ability to lift and carry, stand and walk, postural limitations, manipulative limitations, significant pain, and depression (as opined by Dr. DeLuca).  *Id.*

The ALJ found that McNeel retained the RFC to perform a "significant range of sedentary work."  R. 20, Finding 11.  According to the ALJ, McNeel could lift and carry no more than ten pounds occasionally; sit for no more than one and a half to two hours at a time; and stand or walk for no more than one hour at a time.  R. 18.  The ALJ correctly recognized that McNeel's non-exertional impairments precluded exclusive use of the grids to establish that Jarvis could perform other work that exists in the national economy.  *See* R. 19.  The ALJ thus relied on VE testimony to help him determine whether a significant number of jobs exist in the national economy that McNeel could perform given his RFC and other vocational factors.  Reliance on VE testimony is proper where the hypothetical questions posed by the ALJ accurately depict a claimant's impairments.

At the hearing the ALJ asked the VE to assume an individual who:

> could work on a job that wouldn't require them to stand for more than an hour at a time, not for the day, but at a time.  Assume that the job might require him to stand for 15, 20 minutes, 30 minutes, but never more than an hour at a time and walk more than an hour at a time and sit more than one and half to two hours at a time . . .

R. 430.  The ALJ further proposed that the individual had no transferable skills and would therefore only be able to work unskilled jobs.  R. 431.  The VE responded that the individual described would be able to perform "light and/or unskilled assembler work or bench work" that existed in significant numbers in the national and local economies.  *Id.*  On cross-examination, the VE stated that the jobs mentioned would require sitting for up to two hours at a time with a break at the end of the two hours, after which the individual would return to sitting.  R. 432.  The VE also testified that "some [of the described] jobs allow for some standing as an option."  *Id.*  The VE further testified that the jobs involved sitting for most of the time.  *Id.*

As discussed earlier, the record shows that, other than undergoing the surgery in 2001, McNeel did not seek extensive medical treatment between 1999 and 2002.  In fact, he worked as a landscaper and truck driver during that period.  Several examining and consulting physicians placed restrictions on McNeel's ability to work, but never restricted McNeel from working altogether. In addition, McNeel never sought pyschiatric or psychological treatment for any mental impairments.  He never even complained of mental impairments to his various treating physicians.  Thus, substantial evidence supports the ALJ's hypothetical description of McNeel's physical capabilities.

In his decision, however, the ALJ did not discuss Dr. DeLuca's opinion as to McNeel's mental status. In fact, the ALJ failed to discuss McNeel's mental impairments at all.  *See* R. 14 - 21.  Dr. DeLuca opined on July 11, 2002 as to McNeel's daily functioning and activities of daily living: "[McNeel] is has [sic] impaired social functioning, task persistence, concentration difficulties, and deterioration in work-like settings"; and McNeel suffered from Depression, with a fairly low GAF score of 45.  R 320.  In her brief, the Commissioner seems to argue that the ALJ's failure to discuss

-35-

Dr. DeLuca's opinions was harmless error, although the Commissioner does not explicitly concede error.  *See* Docket No. 15 at 14 - 15.  The Commissioner argues that the ALJ provided a "full and fair explanation of the grounds for denying [McNeel's] application," and that "Dr. DeLuca's assessment of functionally relevant depression was inconsistent with his own mental status examination findings." *Id.* at 14.

Indeed, the ALJ *should* have explicitly discussed Dr. DeLuca's opinions.  Nevertheless, the record is sufficiently clear.  The ALJ rejected Dr. DeLuca's opinions and McNeel's claims of a severe mental impairment.  During the hearing, the ALJ specifically stated that "there's no indication from a medical standpoint that [McNeel] had any emotional problems that were documented." R. 426.  The ALJ also concurred with the state agency physicians in their determinations that McNeel was not disabled during the relevant time period.  R. 20, Finding 14.

Substantial evidence supports the ALJ's RFC finding, as well as the hypothetical question posed to the VE.  None of McNeel's treating physicians diagnosed depression, or even mentioned any mental impairments in their treating notes.  As stated earlier, McNeel never sought treatment for any mental impairments.  The first mention of a mental impairment was in Dr. DeLuca's evaluation on July 11, 2002 — seven weeks before the commencement of McNeel's disability on September 1, 2002.[4]  At the examination, Dr. DeLuca made a general diagnosis of "Depression," but failed to specify the type and severity of McNeel's depression.[5]  Dr. DeLuca did not assess the overall level of

---

[4]Dr. Prickett, a non-examining state agency psychologist based his later finding of Depression on Dr. DeLuca's.  *See* R. 400.

[5]Dr. DeLuca did not make a specific diagnosis of the form of depression, and did not include a diagnosis code from the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) ["DSM-IV"].  The DSV-IV provides the diagnostic criteria for various forms of depression.  For example, the diagnostic criteria for DSM-IV 296.3 Major Depressive Disorder are the presence of two or more major depressive episodes including: depressed

McNeel's functioning in the past year, although he did assign McNeel a GAF score of 45 for the day of the evaluation.  R. 320, DSM-IV at 30.  Even serious mental symptoms exhibited on a single day just before the onset of disability does not require a finding of a significant non-exertional factor, does not require the rejection of the ALJ's hypothetical question to the VE, and does not require a backward expansion of the disability period to include that date.

Dr. DeLuca's prognosis for McNeel's mental status was "guarded."  Nevertheless, McNeel's competency to manage his own funds was "adequate;" his perceptual functioning was "normal"; his cognitive functioning was "adequate"; and he was of average intelligence with neuropsychological deficits in the areas of short-term and recent memory and concentration.  R. 319, 323.  In contrast, Dr. Prickett, the non-examining state agency psychologist, opined that McNeel's mental impairments were neither mild nor severe, and that McNeel did "not have significant difficulty with memory or concentration."  R. 386, 396, 400.  The record does not support McNeel's claim that he was disabled between June 1, 1999 and August 31, 2002.

## VI.    CONCLUSION

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.  The Clerk

---

mood most of the day, nearly every day; markedly diminished interest or pleasure in all, or almost all activities most of the day, nearly every day; significant weight loss; insomnia or hypersomnia nearly every day; psychomotor agitation or retardation nearly every day; fatigue or loss of energy nearly every day;  feelings of worthlessness or excessive or inappropriate guilt nearly every day; diminished ability to think or concentrate, or indecisiveness, nearly every day; recurrent suicidal ideations.  But Dr. DeLuca did not diagnose Major Depressive Disorder.

Moreover, Dr. DeLuca's diagnosis did not include the severity of McNeel's depression either by description ("Mild", "Severe") or by diagnosis code ("296.3x").  In the case of Major Depressive Disorder, for example, the last digit in the DSM-IV diagnosis code is reserved as a severity specifier for the most recent Major Depressive Episode that forms part of the disorder. A "severe" Major Depressive Episode is one that has "several symptoms in excess of those required to make the diagnosis, and symptoms markedly interfere with occupational functioning or with usual social activities or relationships with others."  DSM-IV at 378.

should enter a judgment and close the case.

**DONE AND ORDERED** this 20th day of September, 2006.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia      30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL            33602

The Honorable Theodore S. Haynes
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL            32817